### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| | ) | |
| IN RE | ) | CHAPTER 13 |
| | ) | |
| MARY ADAMS, | ) | CASE NO. 09-70001 |
| | ) | |
| Debtor. | ) | |

_____

### MEMORANDUM DECISION

The matter before the Court concerns the claim of Roundup Funding, LLC

("Roundup") which was objected to (the "Objection") by the Debtor on August 25, 2009 on the

basis that the debt was incurred fraudulently by an individual using the Debtor's identity.  For the

reasons set forth in this Memorandum Decision, the Court will allow Roundup's claim.


### FINDINGS OF FACT

The Debtor initiated her bankruptcy on January 2, 2009.  In her petition she listed

her name as "Mary Adams" and represented that she had during the preceding eight years also

used the trade names of "Adams Grading & Trucking, Inc." and "Dump Trucks, Inc."  Roundup

filed its claim, Proof of Claim No. 15, on April 30, 2009.  This claim asserts as an obligation of

the Debtor debts incurred on a credit card account originally opened with "FIA Card Services aka

Bank of America."  Roundup amended its claim twice, first on October 21 and then on

November 23.  In the first amendment a slightly higher amount was claimed and additional

documentation was attached comprised of what are purportedly several of the monthly account

statements for the credit card.  In the second amendment Roundup attached a redacted copy of

the credit card application, a copy of a letter written by the Debtor to Bank of America dated

January 30, 2006 in which the Debtor denies liability for an account for which the account number has been redacted,[1] and a document dated July 5, 2002 which states "I MARY ADAMS am resigning my position, as president of DUMP TRUCK'S INC. there is corporate resolution to this dated 07/05/2002 page 07."[2]  In addition to the claim itself and amendments thereto, Roundup also filed on January 6, 2010 a Motion to Allow Amended Proof of Claim along with a memorandum entitled Legal Argument in Support of Roundup Funding, LLC's Proof of Claim #15, as Amended which was docketed the next day.  Pursuant to this motion and memorandum Roundup sought the Court's permission for the allowance of additional evidence in support of its claim including an affidavit attached as an exhibit to the motion itself.  As a result of this motion the Court held an additional evidentiary hearing on February 3, 2010, which followed an earlier evidentiary hearing on December 16, 2010 at which the Debtor testified in support of her Objection to Roundup's claim.[3]

This Court's February 10, 2010 Memorandum Decision granted Roundup's January 6, 2010 Motion to Allow Amended Proof of Claim.  This Memorandum Decision

---

[1] This letter is dated after three checks signed by Mary Adams upon her personal bank account had been used to make payments which were credited to the disputed account at issue here as detailed at pages 13-14 of this decision at footnote # 9.

[2] The Court has observed in documentation such variations like "Dump Truck's Inc." and "Dump Truck Inc.," although checks drawn on a company account for this entity indicate the entity's name is "Dump Trucks Inc."  Nevertheless, for purposes of this Memorandum Decision the entity will simply be referred to herein as "DTI."

[3] The Court also held a hearing on several other objections to claims on November 4, 2010 at which the Debtor testified.  The Objection now at issue was not before the Court that day, however, as counsel requested a continuance of it prior to the Debtor's testimony.  A continuance was granted by the Court and said matter was continued to the December 16, 2010 date.

describes in detail the procedural and evidentiary history relating to this dispute and may be

referenced for a more complete account of that background.[4]  After that decision was made, the

parties conducted additional discovery.  With the parties having presented the evidence which

they wished to offer and having made their written and oral arguments, the record indicates the

following:  The Debtor was once married to Dorian Adrian Adams.  Mr. and Mrs. Adams

married in or around 1985 and separated and divorced in or around 1999.  According to the

Debtor, she formerly was engaged in the business of landscaping with her company "Lawn

Enchantment."  (Transcript of Hearing Held December 16, 2009 32:3.)  After marrying Mr.

Adams the name was changed to "Adams Grading and Trucking" and the business thereafter

included trucking and grading services in addition to landscaping.  *Id.*  However, in or around

1999 Mr. Adams left the Debtor for another woman, Susanne Terry ("Terry"),[5] which was the

cause of their separation and divorce.  Nevertheless, the business relationship continued for a

number of years after that occurred.

The Debtor testified she was obligated to provide Mr. Adams with equipment and

personal property after the divorce and obligated to pay Mr. Adams as well.  Although the Debtor

testified that this was the extent of her involvement and that she was "not really" involved with

DTI, the record indicates that the Debtor assisted Mr. Adams for a number of years with DTI by

serving as a corporate officer at least for purposes of business filings and further assisted DTI by

---

[4] *See* Docket Entry No. 192, Memorandum Decision entered February 10, 2010.

[5] Terry's first name has been observed in documentation to include the variations "Susan" and "Suzanne" but the North Carolina Department of Correction Offender Public Information record admitted into evidence indicates Terry's first name is "Susanne."

3

maintaining records and assisting with financing.[6]  For example, in a

_____

[6] The Debtor in response to a question of opposing counsel as to whether she was "involved in [DTI] at all?" responded "The only way I was really involved is because of the divorce settlement, I had X number of years to provide him with X number of equipment and stuff."  (Transcript of Hearing Held December 16, 2009 32:11-15.)  Dorian Adams testified in response to questions from opposing counsel on February 3, 2010 to the following:

> Q.  And this credit card you're talking about here, is this the credit card that, that Miss Adams got?  That Mary Adams got?
>
> A.  She got me the credit card to help me get established in Florida.
>
> Q.  Okay, in what year?
>
> A.  Oh, Lord, I don't know.  That, we're talking, I went down there in January 13th of '02.
>
> Q.  Okay.  So she got a card somewhere after you went to Florida, or do you know when it was?
>
> A.  I don't, I, that long ago, I wouldn't want to swear to when it was gotten.  I, I know she, she helped me obtain credit, because I didn't have credit.

(Transcript of Hearing Held February 3, 2010 8:10-22.)  Mr. Adams further testified in response to the Court's questions on February 3 to the following:

> Mr. Adams:   . . . I sent 'em to be part of the records.
>
> The Court:  Part of what records?
>
> Mr. Adams:  The records for DTI.
>
> The Court:  Well, records that were maintained by whom?
>
> Mr. Adams:  I, I kept 'em in Florida.  I, I've tried to keep up with it, and I, I fell into a rut that I could no longer take care of it by myself.
>
> The Court:  All right, so?
>
> Mr. Adams:  And I sent 'em -

4

letter[7] the Debtor drafted, she admits having assisted Mr. Adams with establishing DTI in Florida

by serving as president of the corporation until at least July 2002.  In this same letter she also

acknowledges having assisted DTI in obtaining a checking account at Bank of America in Lake

City, Florida of which she was a signatory.  Although documentation the Debtor introduced tends

to support her contention that her involvement with DTI ended in 2002 to 2003, Mr. Adams

testified that the Debtor later "stepped in to try to get things straightened out."  (Feb. 3 Transcript

at 13:13-14.)  Although Mr. Adams' testimony was vague as to when the Debtor "stepped in,"

the record appears to indicate that Mr. Adams was sending documentation to the Debtor for the

purpose of maintaining records for DTI as late as 2006 or 2007.  An additional document dated

October 10, 2005, states "I Mary R. Adams am giving all rights, property, assets, from Dump

Truck's Inc. to Dorian A. Adams.  I will no longer be any part of said company."  (Exhibit B 10th

pg. to Roundup Funding, LLC's Supplemental Response in Opposition to Debtor's Objection to

Claim Number Fifteen (15).)  Thus, although the Debtor has maintained that her involvement

with DTI was minimal, it appears she provided assistance to her former husband for a number of

---

> The Court:  The records maintained by whom?  Ms. Adams?
>
> Mr. Adams:  Yes.
>
> The Court:  Mary Adams?
>
> Mr. Adams:  Yes.

(Feb. 3 Transcript at 20:8-23.)

[7] This letter was admitted into evidence on November 4, 2006 and is dated February 8, 2006.  The letter is directed to the OCC, which the Debtor confirmed was the Office of Comptroller of the Currency.  Counsel for the Debtor asked the Court to take judicial notice of this and other documentation admitted at the November 4 hearing when Roundup's Objection came before the Court for hearing on December 16, 2009.

years since the divorce and during and after the time in which she was first learning of Terry's

wrongful use of her identity and personal information to obtain credit.

According to the Debtor, she first learned of the theft of her identity in or around

2001 to 2002.  The Debtor introduced a number of exhibits to support this fact and those

documents tend to indicate that Terry in particular had used the Debtor's identity to fraudulently

obtain credit and pass herself off as Mrs. Adams.  For example, a letter dated November 29, 2001

directed to the Debtor from the Commonwealth of Virginia Department of Motor Vehicles states:

> In reviewing the information provided, it does appear another
> individual submitted an application for a duplicate driver's license to
> DMV on August 14, 2000 using your name and social security
> number.  In order to differentiate between you and the suspect a new
> (driver's license) record was established in your name using a
> computer generated control number.

(Debtor Exhibit 3 from Evidentiary Hearing Held November 4, 2009.)  Another document, a

Virginia misdemeanor warrant of arrest, indicates that Terry, on January 26, 2001, was charged

with producing a false identity to a law enforcement official and a Virginia felony warrant arrest

indicates that on the same date Terry was charged with obtaining property by false pretenses.

According to the Debtor, Terry had formerly been employed with her business prior to leaving

with Mr. Adams.  According to additional documentation, Terry's past further includes arrests

and convictions for forgery in 1999.  As late as August 2004 it appears that Terry was using the

Debtor's identity.  According to a Smyth County, Virginia criminal complaint Terry was charged

with shoplifting and during the course of the investigation had apparently asserted the Debtor's

identity as her own.

It was in 2004 that the account which serves as the basis for Roundup's claim was

opened.  Roundup attached a redacted copy of the application to its second amended claim and

an unredacted copy was later provided to the Court.  The application itself includes a handwritten

date of May 8, 2004 and according to a business record provided by Bank of America through

Roundup, the account itself was activated June 2, 2004.  The account application refers to a First

Charter Platinum Plus® Credit Card.  The application includes the Debtor's name and address in

print which may indicate that it was mailed to the Debtor or provided to the Debtor upon request

and additional information appears to have then been filled in by handwriting.  This additional

information includes a social security number, a mother's maiden name or other password,

occupation, telephone number, etc.  The document contains what is allegedly the signature of

Mary Adams.

       At trial the Debtor denied both that the signature on the account application was

hers and that she had authorized the opening of the account.  She testified that the name

appearing on the line requesting "Mother's Maiden Name or Password" contained a name

different than her mother's name and was one which she could not identify.  However, the

Debtor represented through her counsel that the social security number listed on the credit

application is in fact a replacement number which was given to the Debtor by the Social Security

Administration but one which she claims never to have used.[8]  The Debtor further represented

through her counsel that she has no idea how the replacement social security number was

obtained by anyone.  It appears from the record that Terry had used the Debtor's original social

security number to obtain the false driver's license in 2000.

---

[8] This information was provided in a letter by Debtor's counsel responding to an inquiry
of the Court concerning the discrepancy between the social security number listed on the
redacted application and the social security number observed in the Debtor's bankruptcy filings.

Although the account at issue does appear to have been opened in June 2004, the Debtor contends that she was unaware of such account having been opened in her name until June 2005 when she was contacted by Bank of America. The Debtor testified that it was not until after that contact that she was sent a bundle of the account statements relating to this account. The Debtor stated that this was the first time she had seen these statements. A number of these statements were introduced as business records of Bank of America along with checks drawn on the Debtor's checking accounts at Wachovia and Grayson National Bank which appear to be posted and credited to the account on several of these statements.

At the February 3 hearing, the Debtor's son, Robert E. Johnson, II, testified concerning his employment with DTI in connection with one or more contracts it continued to service in Virginia. Mr. Johnson testified that while employed for DTI he was given a credit card by Dorian Adams, although he was not certain that Mr. Adams had given him the card. Mr. Johnson testified that the card was for the purpose of paying for fuel and other job-related expenses. However, Mr. Johnson testified that he would also oftentimes use the card for personal expenses. Mr. Johnson testified that when he would use the card for personal expenses, he was informed monthly by Mr. Adams as to the amount owed. Mr. Johnson testified that sometimes Mr. Adams would simply tell him how much was owed and other times Mr. Johnson was shown a photocopy of the account statement charges.[9] When questioned about the account statements though, Mr. Johnson could not confirm any of the information on the account statements he was shown other than particular charges which he said had been incurred by him.

---

[9] Mr. Johnson testified that in the latter part of his employment when Mr. Adams was short on funds, Mr. Adams would not require Mr. Johnson to reimburse him for personal charges on the credit card, in effect compensating him for his employment in such manner.

8

Likewise, Mr. Johnson could not confirm the name on the credit card itself, although he thought it might have been DTI.  Thus, he could not confirm that the account was an account of DTI as the Debtor contended.

Mr. Johnson also testified concerning checks provided by Roundup which are purportedly drawn on the Debtor's checking account and purportedly were tendered to Bank of America as payment on the account.  Although Mr. Johnson's affidavit states that he would give the Debtor money for his personal charges and the Debtor would send the check to the credit card company, he testified in Court that he would pay her and she would write the check in such amount, sign it, and then he personally filled in the payee and account number, in effect using her as a money order service.  Mr. Johnson testified that he would then mail the check to the address listed on the back of the credit card.  When asked whether he could confirm whether the checks provided by Roundup were ones he recognized, he testified that he recognized his handwriting on the checks as to the payee information and the memo line information.

At the same hearing, Dorian Adams testified about his relationship with the Debtor, including statements concerning the Debtor's assistance with DTI as noted previously. However, the Debtor offered Mr. Adams primarily as a witness to support her contention that the account in question was in the name of DTI rather than an account which she opened.  Testimony was elicited from Mr. Adams to support the contention that copies of certain checks attached to an affidavit of the Debtor were in fact copies of checks upon DTI's bank account in payment of charges on the credit card account in question.  However, the Court has observed that none of these checks appear on any of the account statements offered by Roundup nor do any of the purchases indicated on the receipts similarly provided, although it is important to note that

9

Roundup has not offered a continuous unbroken chain of statements since the opening of the

account in June 2004.  The statements that have been provided to the Court span the time periods

of August 2004 to January 2005, January 2006 to December 2006, November 2007 to September

2008, and one statement for April 2009.  The checks provided by the Debtor for DTI are dated

July 19, 2005, November [illegible] 2005, March 25, 2007, June 18, 2007, and October 20, 2007.

The statements provided by the Debtor for DTI MasterCard purchase receipts are dated May

[illegible], 2006, May 23, 2006, and May [illegible], 2006.

   The last purchases made on the account in question appear to have been made in

January 2008 and said purchases were posted to the February 2008 account statement.  It is

particularly noteworthy that these last purchases, $176.02 at Fragrancenet.com and $97.73 at Dell

Service & Support, were made at a time when Terry was in custody.  According to an exhibit

produced by the Debtor, Terry was incarcerated in the State of North Carolina from November 2,

2007 until her release on May 30, 2008.  The last statement provided to the Court which does not

fall after the petition filing was an account statement for September 2008 which reflected a

balance on the account of $9,934.57 at that time.  This is the same amount noted in the original

proof of claim but Roundup's amended proof of claim reflects that the account was charged-off

on August 30, 2008 at a balance of $9,895.57, which amount is precisely $39 less than the

balance reflected on the September 2008 statement and appears to reflect the amount of the

monthly late fee for payment which was being charged at the time.  After charging off the

account, interest accrued on the charge-off balance at the rate of .000684658 daily for the 125

days until the bankruptcy filing.  Thus the amount of the claim on the date of the bankruptcy

filing and the amount of the claim asserted by Roundup in its amended proof of claim is

$10,742.45.


## CONCLUSIONS OF LAW AND ADDITIONAL FINDINGS OF FACT

This Court has jurisdiction of this proceeding by virtue of the provisions of

28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the

District Court on July 24, 1984.  This matter, which involves an objection to the allowance of a

claim against the Debtor's bankruptcy estate, is expressly designated as a "core" bankruptcy

proceeding by 28 U.S.C. § 157(b)(2)(B).

The applicable principles which govern the Court's determination of this matter

are contained in the Bankruptcy Code, the Bankruptcy Rules and governing case authority.  11

U.S.C. § 501(a) provides for a creditor to file a proof of claim.  The following section, § 502(a),

provides that a proof of claim which is filed pursuant to § 501(a) will be allowed unless a party in

interest objects.  In that event § 502(b) authorizes the court, after notice and a hearing, to

determine the proper amount of such claim as of the petition filing date.  If a claim is

"unenforceable against the debtor" for any reason other than "because such claim is contingent or

unmatured," it is to be disallowed pursuant to § 502(b)(1).  The dispute before the Court involves

the basic question of whether or not the Debtor under non-bankruptcy law is liable upon the

credit card which is the basis for Roundup's claim, in other words, whether the claim is

enforceable against the Debtor.

Bankruptcy Rule 3001(c) provides that "[w]hen a claim . . . is based on a writing,

the original or a duplicate shall be filed with the proof of claim."  Subsection (f) of that Rule

provides that "[a] proof of claim executed and filed in accordance with these rules shall

11

constitute prima facie evidence of the validity and amount of the claim." The United States

Court of Appeals for the Fourth Circuit has described the operation of that subsection of the Rule

as follows:

> The Bankruptcy Code establishes a burden-shifting framework for
> proving the amount and validity of a claim. The creditor's filing of
> a proof of claim constitutes prima facie evidence of the amount and
> validity of the claim. (citations omitted) The burden then shifts to
> the debtor to object to the claim. (citations omitted) The debtor must
> introduce evidence to rebut the claim's presumptive validity.
> (citations omitted) If the debtor carries its burden, the creditor has the
> ultimate burden of proving the amount and validity of the claim by a
> preponderance of the evidence.

*In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004). In the matter before the Court the

Debtor has certainly offered evidence "to rebut the . . . presumptive validity" of Roundup's claim

by testifying under oath that she did not sign the account application and did not otherwise

authorize the opening of the account or any charges which have been made upon it. Therefore,

the critical question is whether Roundup has provided sufficient evidence to persuade the Court

by a preponderance of the evidence that the Debtor's denial of responsibility is incorrect and that

she is indeed responsible for the account.

The account documentation offered by Roundup is considerable although it is not

complete and leaves a number of questions in the Court's mind about the history of the account.

For example, it contains a number of account statements for the disputed account over the period

from the indicated opening of the account in 2004 until it was sold by Bank of America to

Roundup in 2009, but statements for a number of months are not provided, including statements

over the period of February 2005 thru December 2005 during which the balance owing on the

account increased from a balance of $1,746 to a balance of $9,098.92. Similarly, the statements

provided do not include those months[10] for that period of time represented by the checks on the

DTI checking account which the Debtor asserts were paid on this account by such company.

Furthermore, although Roundup at the beginning of an evidentiary hearing in this matter on

December 16, 2009 moved for a continuance so that it could obtain a comparison by a

handwriting expert of the signature on the account application with various acknowledged

examples of the Debtor's signature, which the Court ultimately allowed by its Order entered

February 10, 2010, it then, according to the verbal representation of its counsel, decided that it

should not be obliged to incur such an expense to have its claim allowed.  This desire on

Roundup's part to dispute the Debtor's objection so long as the cost of doing so is not

burdensome has made the ultimate determination of its claim quite difficult.

      As a part of its amended claim Roundup has provided copies of a number of

reported account statements and various checks on personal bank accounts of the Debtor which

were applied to the account.  These various documents are exhibits to an affidavit it has offered

from one Debra L. Pellicciaro, who represents in that document that she has the position of

"Bank Officer" of Bank of America, and that the exhibits to her affidavit are copies of records

compiled by such bank in the regular course of its business.  One of those records appears to be a

computer log of entries made at the time the account was opened and thereafter.  While counsel

for the Debtor has objected to the absence of any live witness from Roundup or Bank of America

to prove that the account application offered by Roundup is actually the one which is applicable

to the credit card account upon which the proof of claim has been filed and that such application

was actually made by the Debtor, neither counsel nor client has disputed the account statements

_____

[10] July and August of 2005 and June, October, and March of 2007.

in question, although the Debtor has denied that she received them, or that the copies of checks

on her bank accounts were valid.  *See* Federal Rule of Evidence 902(11).  Indeed she offered an

affidavit and testimony from her son to the effect that she wrote checks in blank for him upon her

account for cash he paid her for amounts for which he was responsible to pay on the credit card

account of DTI by which he was employed.

The check copies on the Debtor's bank accounts which were applied to the

disputed account are as follows:

| Date | No. | Payee | Amount |
|---|---|---|---|
| December 13, 2004 | 134 | First Charter | $1,000.00 |
| January 1, 2006 | 604 | First Charter | $150.00 |
| January 19, 2006 | 618 | First Charter | $300.00 |
| February 13, 2006 | 648 | First Charter | $200.00 |
| March 14, 2006 | 175[11] | First Charter | $150.00 |
| June 13, 2006 | 763 | First Charter | $387.00 |
| August 22, 2006 | 839 | First Charter | $166.00 |
| September 20, 2006 | 863 | First Charter | $166.00 |

The account statements for these periods of time covered by these checks are in evidence.  An

examination of them does not demonstrate any apparent relationship between the amounts of

such checks and any particular charges appearing in those statements.  Rather the checks are for

"round" amounts such as $200, $300 and $1,000, or for "odd" amounts which match up with

---

[11] Check No. 175 was upon an account at Grayson National Bank.  The remaining checks
are upon an account at Wachovia Bank, N.A.  All checks are written upon checks containing the
Debtor's name and residence address printed on them.

required minimum payments then due on the account.  More specifically, the payments of

$387.00, $166, and $166, dated June 13, 2006, August 22, 2006, and September 20, 2006,

respectively, were the minimum payments due upon the account statements for June 2006,

August 2006, and September 2006, respectively, and were credited to the account in the

statements for July 2006, September 2006, and October 2006, respectively.  In short, the facts

appearing from the account documentation do not square with the explanation offered by the

Debtor to explain why she would have been writing checks to make payments on an account

which she had not opened or authorized to be used.  It is appropriate to note at this point that

although the Debtor's son did identify checks provided by Roundup as being ones which were

written to make payments for which he was responsible, he did not confirm that the account

statements provided were ones which had been provided to him by his employer nor did he

confirm that the account in question was one of DTI.  The Court need not reject entirely the

explanation offered by Mr. Johnson, as it may very well be as he claimed that his mother did

serve as a check writing service for him to make payments for which he was liable on the card

provided to him by his employer, in order for it to find that such explanation does not account for

the particular checks offered by Roundup which the Debtor has not disputed that she signed.

    Another item of evidence which the Court has found helpful in attempting to

discern where the truth lies is found in the Bank of America computer log.  One of the entries for

June 2, 2004, the date the account was opened, was one relating to the Debtor's social security

number.  The Debtor has admitted to having been issued two distinct numbers by the Social

Security Administration, the second of which was occasioned by the identity theft fraud of which

she was an undisputed victim.  That second number, which was not disclosed in her bankruptcy

filing, ends in the four digits 8336 and appears in the account application provided by Roundup

for this account.  The computer log contains the following entries with respect to that number:

". . . REALIZED 3 YRS AGO THAT HER IDENTITY HAD BEEN STOLEN 4.5 YRS AGO,

WENT . . . COURT TO RESOLVE, SOC SEC ADMIN ISSUED HER NEW SSN (redacted) -

8336 . . . HER ORIGINAL . . . [w]AS # APPEARING ON CBR . . . VERFD BOTH ON FDW . .

." and "[CALLED] WACHOVIA, THEY VERFD APPLICANTS NEW SSN."  (Exhibit A to

Affidavit of Debra L. Pellicciaro.)  The Debtor has represented that she kept such number closely

guarded and had not used it for credit purposes.  Other than denying responsibility upon the

credit card account at issue here, she has not contended that such number was stolen by anyone

else and used to incur credit in her name.  She has indicated, according to the representations of

her counsel on her behalf, that she has no idea how Bank of America could have come into

possession of this number.  The Court finds that there is no reasonable explanation which has

been offered to explain this mystery other than the obvious inference from the Bank of America

computer log that the Debtor provided this number to such bank and also to Wachovia Bank.

The only other possibility which would seem to make any sense at all and be consistent with the

Debtor's claim of non-involvement with such account is that a member of her household found

the number, set up the account, then used it for his or her personal benefit, and that Ms. Adams is

unwilling to implicate an immediate family member, but such a possibility is entirely speculative

and the Court will instead draw the inference which is reasonable from the evidence before the

Court, which is that the Debtor herself provided this information to the bank at the time the

account was opened and perhaps now she has no recollection of having done so.

As part of an effort on the Debtor's part to persuade the Court that the account

16

upon which Roundup is making a claim is an account opened and used by DTI, she has offered

copies of a couple of charges incurred by such corporation and paid for by use of a credit card

ending in digits 6722.[12]   One of those is for a towing bill in the amount of $250 incurred on May

20, 2006.  The account statements provided by Roundup for the account upon which it has filed a

claim include the statement for June 2006, covering charges against such account from the

previous period closing date of May 1, 2006 to the statement closing date of June 1, 2006.  Such

statement does not contain any entry for the towing charge in question.  Neither does the

---

[12] In the affidavit of Debra L. Pellicciaro she asserted the following to be true regarding
the account numbers:

1. FIA Card Services is a wholly owned subsidiary of Bank of America.

2. That the original contract "may not be available."

3. That on June 2, 2004, Mary Adams opened a Bank of America credit card account ending
in number 1418.  Immediately following this sentence is the statement, "A redacted copy of the First
Charter Platinum Plus Credit Card Application dated May 8, 2004, which, upon information and
belief, was completed by Mary R. Adams is attached as Exhibit 'A'."

4. That on November 22, 2004, Ms. Adams filed a "Lost/Stolen claim" upon this account
claiming that the card had been taken from her car and that a new account number ending in 7548
was established.

5. That on June 16, 2006, Ms. Adams filed a fraud claim in the amount of "approximately
$445.29" for this account, that these amounts were credited to her account and that a new account
number ending in 6722 was established for this account.

6. That in September 2008 this account was "charged-off" and a new account number ending
in 1351 was assigned to this account.

*See* Exhibit A to Motion to Allow Amended Proof of Claim.  Although counsel for the Debtor
has objected to the use of this affidavit, he did note in a response to Roundup's January 6, 2010
Motion to Allow Amended Proof of Claim that "It is now known, based upon the statement of a
representative of the Bank of America, that account number 6722 was one of 4 account numbers
used to identify an account purportedly opened by Mrs. Adams."  (Response of Debtor to Motion
for Permission to Amend Claim of Roundup Funding, LLC pg. 1.)

17

following month's statement.  While it admittedly would be a remarkable coincidence for both

the Debtor and DTI to have had credit card accounts ending with the same four digits of 6722,

the Court cannot otherwise explain why a charge made upon the company's card would not

appear on the account statement covering that same month for the disputed account.

Accordingly, the Court finds that the most reasonable inference is that the credit card account

purchased by Roundup from Bank of America is not the same account utilized by the

corporation.  In making that finding the Court observes that all of the photocopies of company

checks offered in evidence by the Debtor are payable to MBNA, which, although indicated to be

a Bank of America entity or trade name, is not a name which appears in any of the account

statements proffered by Roundup.

       Lastly, the Court notes that even though the signature appearing on the account

application is a remarkable likeness of the Debtor's undisputed signature upon other documents,

if it indeed is not actually her signature, she did not require any appreciable length of time to

examine the photocopy of such application at the evidentiary hearing during direct examination

by her attorney to deny forcefully that it contained her signature.  Her denial was immediate and

left the impression that she was fully ready to deny the signature as being her own without even

having to actually examine it.  The Court does not give this impression any appreciable weight,

however, because, in fairness, according to her counsel, he had furnished her prior to the hearing

a copy of the amended proof of claim with a redacted copy of the account application.

Nevertheless, the Court mentions it because it has observed over time that it is not uncommon for

people to become so convinced of the correctness of their memories, beliefs and contentions as to

be rendered impervious to evidence which would support a contrary conclusion.  In any event,

18

however, it is not necessary for the Court to make a finding of fact that the signature on the

account application is that of the Debtor, or even that such application is the one upon which this

particular account was opened, to determine that the greater weight of the evidence which the

Court finds to be credible[13] is that the Debtor approved the opening of this account, used her

unblemished social security number for that purpose, regularly was sent monthly account

statements in her name for it, and made a number of payments upon such account which have not

been satisfactorily explained on any basis other than that she recognized the existence of such

account and made recurring substantial payments on it which justify the fair inference that she

did not dispute that the charges on such account were her legal responsibility.

Although a separate matter to the present Objection at issue here, the Court finds

it appropriate to discuss at this juncture as bearing on its general assessment of the Debtor's

credibility a Discover Card claim filed in this bankruptcy case.  When the Debtor filed her

bankruptcy petition she listed as a claim in Schedule F "Discover Financial S" with an account

number ending in 9414 for a "credit card" in the amount of $6,406.  The Debtor did not dispute

this claim in her original Schedule F.  On January 21, 2009, DFS Services LLC filed a claim,

Proof of Claim No. 4, asserting a claim owed as the result of what appears to be a Discover

Credit Card.  There is one notable difference in that the claim account number ends in 2566 as

compared with 9414.  However, the amount of the claim is listed as $6,406.72.  On August 25,

---

[13] The Court notes that not all of the evidence can be reconciled with either ruling which
the Court might make.  For example, the security name contained on the application, according
to the Debtor's testimony, was neither her mother's name nor any other word which she could
identify.  If that be the case, such fact would certainly tend to support the Debtor's denial of
liability upon this account.  The Court notes that the evidentiary standard governing its findings
of fact is a preponderance of the evidence, not evidence beyond a reasonable doubt.

19

2009 the Debtor filed an objection to this claim asserting that the debt "was not incurred by the

Debtor but was incurred by a third party who stole the Debtor's identity." No response was made

to this objection. On November 4, 2009 a hearing on this and other objections was held. The

Debtor testified generally about the nature of the identity theft involving several of the claims.

Proof of Claim No. 4 was not specifically referred to other than Debtor's counsel stating "I know

we've got Discover and we've got some other, PRA receivables, people that haven't filed

responses." Debtor's counsel then asked if the Court would admit testimony generally as with all

objections not responded to, which the Court allowed. Following the hearing and because the

Court continued the objections so that it could be assured that proper service had been effected,

an Order was tendered and entered by the Court which stated:

> At Abingdon, this matter came before the court for hearing on the
> **objection to claims** [sic] **#4 filed by Discover Bank**. At the time set
> for hearing, the debtor appeared in person and by counsel. It appears
> that no response has been filed to the objections [sic]. Previously in
> a separate hearing the Court admitted into evidence several exhibits
> that described the basis for the objection to the claims: that Ms[.]
> Adams was the victim of identity theft and did not make the debts set
> out in the claims. The court having heard the testimony and
> considered the exhibits, does hereby find that the claims [sic] are not
> the debts of the Debtor and does hereby Order that claim #4 is
> disallowed.

(Doc. No. 151.) (emphasis in original) Accordingly, Proof of Claim No. 4 was disallowed

effective 14 days after the date of entry of the Order unless an objection to the Order was filed.

No objection to the Order was filed and the claim was disallowed.

On December 17, 2009, Debtor's counsel filed an Amended Schedule F after

learning that this had not previously been done. In this Amended Schedule F the Discover claim

was still not disputed. The Court's Memorandum Decision of February 10, 2010 took note of

20

this matter in the following comment:

> It bears noting that a proof of claim was filed by Discover Bank/DFS
> Services LLC for an unsecured claim in the amount of $6,406.72,
> essentially the same amount listed in the Debtor's amended Schedule
> F, but having an indicated account number ending in 2566.  The
> Debtor likewise objected to this claim on the basis that it was the
> result of identity fraud.  Although validly served with this objection,
> Discover Bank failed to respond to it and this claim as well was
> disallowed.

Since that decision was issued, neither the Debtor nor her counsel has offered to provide any

explanation of this discrepancy or filed any motion to request the Court to reconsider the

disallowance of Discover's claim.  As a result of extended discovery with respect to the

Objection to Roundup's claim, the Court now has before it interrogatories of the Debtor and it is

striking to point out that the Debtor answered one interrogatory with the following language:

> So there is no mistake, I had two credit cards, **one with Discover** and
> one which [sic] Sears, both of which I had obtained well more than
> 6 years prior to January 1, 2009 and I continued to make payments on
> those 2 cards within 24 months of the date of the filing of my
> bankruptcy.

(Answers to Interrogatories pg. 3, Exhibit to Stipulation at Docket No. 206.) (emphasis added).

The Court having decided that the preponderance of the evidence supports a

conclusion that the Debtor is liable on the account purchased by Roundup, it must determine the

amount to be allowed.  Roundup's first amended proof of claim contains a calculation of the total

pre-petition amount of its claim.  This is the same amount listed in its second amended proof of

claim.  According to this calculation the account charge-off date was August 30, 2008 and at that

time the charge-off balance was $9,895.57 and with post charge off-interest calculated for the

125 days between charge-off and the Debtor's bankruptcy filing, the total pre-petition claim

listed is $10,742.45.  Accordingly, on the basis of the foregoing decision to deny the Debtor's

Objection, Roundup's unsecured claim of $10,742.45 shall be allowed in that amount.  An Order

embodying the Court's decision shall be entered contemporaneously with the docketing of this

Memorandum Decision.

DECIDED this 13th day of August, 2010.

_William F. Stone, Jr._

UNITED STATES BANKRUPTCY JUDGE